**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **KELLY S.,[1]** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Case No. 3:23-CV-383-MAB** |
| ) | |
| **COMMISSIONER OF SOCIAL** ) | |
| **SECURITY,** ) | |
| ) | |
| **Defendant.** ) | |

<u>**MEMORANDUM AND ORDER**</u>

**BEATTY, Magistrate Judge:**

Plaintiff Kelly S. filed applications for Disability Insurance Benefits (DIB) under Title II of the Social Security Act and Supplemental Security Income (SSI) under Title XVI of the Act on June 23, 2020, in which she claimed disability based on her mental health impairments and associated symptoms. Plaintiff's applications were ultimately denied in a written decision by ALJ Kevin Martin issued on April 4, 2022 (Tr. 13–14). There is no dispute that the ALJ's decision is the final decision of the Commissioner of Social Security (*see* Docs. 19, 25). Plaintiff is presently before the Court, represented by counsel, seeking review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g). For the reasons explained below, the ALJ's decision is reversed.

---

[1] In keeping with the Court's practice, Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. *See* Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

## THE EVIDENTIARY RECORD

The evidence in the record consists primarily of Plaintiff's medical records and records from counseling, a Third-Party Function Report filled out by her grandfather, and the transcript of the administrative hearing before the ALJ. The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is presented in mostly chronological order and is directed at the points raised by Plaintiff.

Plaintiff was born in February 1985 and was 28 years old on the alleged onset date of June 1, 2013 (Tr. 35). The records reflect that Plaintiff has a long history of substance abuse and other psychiatric issues. She described her childhood as a "nightmare" (Tr. 1444). She consistently reported that she started getting high with her mom, who was a heavy drug user and "die hard addict," around 10 years old (Tr. 39, 509, 510, 1438, 1443, 1625). She also consistently reported that her mental health symptoms started as a child (Tr. 37, 510, 513, 1437). She remembered asking her doctor for help at age 11 and she began having panic attacks at age 12 (Tr. 513, 1440). During her teenage years, she had at least one psychiatric hospitalization[2] and also endured a traumatic experience when she found her mom and another man both dead from overdoses (Tr. 38, 510).

Plaintiff reported that in 2007 she overdosed on methamphetamine, was convicted of felony drug possession, and attended inpatient substance abuse treatment (Tr. 509,

---

[2] Details in the records varied and it was hard to tell whether Plaintiff was hospitalized more than once as a teen (*see* Tr. 510 (recounting that she was taken to inpatient by her parents in Jan. 2003), 1638 (recounting admission at age 17); 2035 ("when she was 17 she was taken to the Pavilion after finding her mother who was killed . . . in a drug-related incident")).

1638, 2034). Plaintiff reportedly stayed clean until 2014, when she relapsed following the birth of her daughter (Tr. 509–10, 1438). During the time she was clean, she worked at fast food restaurants and as a server at a steakhouse (Tr. 36; *see also* Tr. 240–42, 247). She described herself as "very capable of things" at that time (Tr. 36).

Records show that Plaintiff attended substance abuse therapy—both group and individual sessions—from June 2012 through 2013 at Centerstone of Illinois (Tr. 1541–1616). According to Plaintiff's testimony and the treatment records, her anxiety got worse in 2013, which she attributed to increased stress from an abusive relationship, her job at the steakhouse, and other personal issues (Tr. 38, 1582, 1584). Some of the notes from counseling sessions in 2013 indicate she was tearful and upset (Tr. 1573, 1582). She often reported being very stressed, and her dosage of Xanax was increased (Tr. 1562, 1570, 1562, 1566, 1584). At one appointment, she reported sleeping a lot, feeling "incapacitated by depression" and "trapped," and said she had "never before felt so much like a basket case" (Tr. 1573). During other appointments, she needed help processing her feelings of sadness and/or guilt (Tr. 1551, 1558, 1560). From time to time, she said things were going "a little better" (Tr. 1545, 1547, 1553, 1574).

By January 2014, Plaintiff was pregnant, and she reported being "very stressed out" by her partner and having a resurgence of PTSD symptoms (nightmares) (Tr. 1541). The dosage of her anxiety medication had been increased by her doctor despite being pregnant (*Id.*). Plaintiff gave birth to her daughter on March 25, 2014 (Tr. 371, 1538). Within two months of giving birth, Plaintiff reported to both her counselor and her primary care physician at Johnson City Community Health Center that she had been

experiencing some depression and an increase in her PTSD symptoms, including "bad flashbacks" (Tr. 371–73, 1534; *see also* Tr. 1284). She also reported that her OB/GYN had increased her dose of Xanax to 2mg (Tr. 371–73).[3] In May 2014, her physician wrote that she was "very emotionally unstable at current time" and having "significant issues" with her partner (*Id.*). Her diagnoses were listed as anxiety, depression, PTSD, and postpartum depression (*Id.*). She was started on venlafaxine, in addition to the Remeron and Xanax she was already taking (*Id.*; *see also* Tr. 368). In June, the venlafaxine was doubled (Tr. 368). And in July, she switched to Zoloft (Tr. 365). It was around this same time that Plaintiff no-showed to a counseling session, and all of her counselor's calls in the months that followed went unanswered (*see* Tr. 1530–33; *see also* Tr. 1281–83).

In August 2014, Plaintiff told her doctor that her symptoms were worsening and she "had a mental break down" (Tr. 359). She said she was crying a lot, was emotionally unstable, and was unable to leave the house (*Id.*) Two weeks later, she reported that she was "doing well" but still wasn't "where she needs to be" (Tr. 355). At a follow-up visit in October 2014, Plaintiff reported the Zoloft "wasn't working" (Tr. 351–53). Her doctor noted "Agitation. Anxious. Compulsive behavior. Patient is in denial. Flight of ideas. Hopelessness. Inappropriate affect—depressed. Increased activity. Mood swings. Poor insight. Poor judgment. Explained that if she is bipolar she needs additional rx for stability" (*Id.*). Plaintiff's dosage of Zoloft was reduced and she was started on Abilify (*Id.*). Over the next couple months, Plaintiff reported her anxiety symptoms were

---

[3] The Court notes that there are no medical records from Plaintiff's OB/GYN in the administrative record.

"relieved with current dosages" or "stable" (Tr. 342–46, 347).

However, in late December 2014, Plaintiff was taken to the emergency room at Heartland Regional Hospital following a domestic dispute with her fiancé and reporting thoughts of hopelessness (Tr. 1354–59, 1529). She was disheveled, had a depressed mood and flat affect, and was anxious about her relationship (Tr. 1354–59). She was assigned a GAF score of 48 (Tr. 1358), which correlates with "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting)" or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."[4] Days later, Plaintiff reported to her doctor that she was having panic attacks about twice a day and her anxiety made her nauseous (Tr. 340). Her dosage of Zoloft was increased (*Id.*).

In February 2015, Plaintiff reported "improvement" in her depression symptoms and insomnia, "but not enough" (Tr. 338). Her dosage of Zoloft was again increased (*Id.*).

---

[4] The Global Assessment of Functioning (GAF) score is a numeric scale of 0 through 100 used to assess severity of symptoms and functional level. *Yurt v. Colvin*, 758 F.3d 850, 853 n.2 (7th Cir. 2014) (citing *Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* ("DSM VI"), 32 (4th ed. text revision 2000)). The higher the number, the better a person is functioning. A score of:

- 41 to 50 reflects "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting)" OR "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."
- 31 to 40 reflects "some impairment in reality testing or communication (e.g., speech is at times, illogical, obscure, or irrelevant)," OR "major impairment in several areas such as work or school, family relations, judgment, thinking, or mood (e.g., pressed man avoids friends, neglects family, and is unable to work)."
- 21 to 30 reflects "[b]ehavior [that] is considerably influenced by delusions or hallucinations," OR "serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation," OR "inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)."
- 11 to 20 reflects "[s]ome danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement)," OR "occasionally fails to maintain minimal personal hygiene (e.g., smears feces)," OR "gross impairment in communication (e.g., largely incoherent or mute)."

*DSM VI*, p. 34.

And in April 2015, Plaintiff reported panic attacks during which she "cannot breathe," she feels her body jerk, and she is "unable to remember until 2 hours later" (Tr. 333, 334). She was referred to psychiatry and to neurology (Tr. 334).

It was around this time that Plaintiff was arrested for possession of controlled substance (Tr. 2034; *see also* Tr. 332). She later admitted that she had started using drugs again after giving birth (*e.g.,* Tr. 509–10, 1438). Plaintiff is said to have completed a residential drug rehabilitation program around this time (Tr. 2034), although there are no records from the rehab program in the administrative record.

Plaintiff next saw her doctor in August 2015 (Tr. 331–32). She endorsed continued anxiety and "black out moments." She reported that in the last two weeks there were "several days" where she had little interest or pleasure in doing things and she felt bad about herself or that she was a failure or that she had let her family down (*Id.*). And on "more than half the days," she had trouble concentrating on things (*e.g.,* reading the newspaper or watching television) and was "moving or speaking so slowly that other people could have noticed; or the opposite, . . . fidgety and restless" (*Id.*).

Following this appointment, there is a gap in the records until April 2016,[5] when Plaintiff went to the emergency department at Union County Hospital, reporting increased depression and feeling hopeless, helpless, and worthless (Tr. 1624–39). She said she was taking her medications as prescribed, but they were not helping (*Id.*). The ER

---

[5] It appears that by late 2015, Plaintiff had switched her primary care to Dr. Aaron Newcomb at Shawnee Health Care in Carbondale, Illinois (*see* Tr. 1408). However, there are no medical records from Dr. Newcomb in the administrative record.

physician deemed Plaintiff to be an imminent danger to herself due to her depression and suicidal ideation, and she was transferred to Harrisburg Medical Center (also referred to as the Mulberry Center) for a psychiatric evaluation and voluntarily admitted (*Id.*). She was described as "paranoid," "guarded," and "suspicious" but with no overt psychotic features, and she had "difficulty staying focused and maintaining concentration" (Tr. 1625). Her insight and judgment were "limited," and the physician assigned a GAF score of 20 to 30 (*Id.*). This corresponds with a "serious impairment in communication or judgment," or an "inability to function in almost all areas." *See supra* n.4. Plaintiff was diagnosed with a bipolar disorder, anxiety disorder, polysubstance dependence, and borderline personality disorder (Tr. 1625). She was prescribed a raft of medications during her stay, including Ambien and Restoril to help her sleep, nicotine patches, Latuda and Depakote to stabilize her mood, Ativan for anxiety symptoms, and Remeron for nightmares and mood symptoms (Tr. 1626, 1634). She was discharged after four days at her request and after her suicidal ideations had abated (Tr. 1628).

There is another gap in the records from April 2016 until January 2017, when Plaintiff re-established counseling services at Centerstone while she was in the Franklin County Jail following her arrest in late 2016 for possession of methamphetamine and controlled substances (Tr. 1408, 1410; *see also* Tr. 1404, 1496–1501). Plaintiff was released on bond on February 22, 2017, and saw her counselor for a diagnostic assessment a couple weeks later (Tr. 1443–46; *see also* Tr. 1451–53, 1492–94). Plaintiff's counselor wrote that she was having "a mental health crisis" and had been off drugs due to her incarceration and was attempting to get back on her psychiatric medications before she relapsed (Tr. 1465).

Plaintiff reported that she had been so depressed she could not get out of bed and could sleep for three or four days at a time (Tr. 1444). She endorsed agitation and anger, fatigue and loss of energy, weight gain, feelings of worthlessness and guilt, and thoughts of death (Tr. 1451–53). She said the depression had been present without remission since her daughter was born two years prior, but her medications helped control some of the symptoms (*Id.*). She also had periods of hypomania, which usually lasted around four days, and then she would cycle to a depressive state for two to three weeks (*Id.; see also* Tr. 1483). During her manic phases, Plaintiff was very talkative, distracted, had racing thoughts, and was more likely to relapse (Tr. 1451–53). As for the anxiety, she said it was there "every minute of every day." (*Id.*). She said she could not go into stores, had trouble relaxing, worried too much about things, could not control her worry, and was afraid something awful was going to happen (*Id.*). The counselor noted that "the severity/complexity of symptoms, behaviors, and functional skill deficits including distress to [Plaintiff's] life [was] severe" (*Id.*).

Plaintiff met with a clinician to develop a treatment plan and reported that her thoughts were racing and she "felt like she was going crazy" (Tr. 1487). She was described as "very anxious," "unable to focus," "tearful," and "noticeably shaky" (*Id.*). The clinician noted that Plaintiff's "mental capacity was so decompensated that she was unable to concentrate on communication and understand [the] full content of services being discussed," and they were not able to complete the treatment plan (*Id.*). It was further noted that if Plaintiff was "off her medications and not using substances" then she needed "to see the psychiatrist immediately or she [would] end up in the psychiatric hospital

very soon based on [her] presenting [state]" (Tr. 1485).

While waiting to see the psychiatrist for medications, Plaintiff attended three individual counseling sessions (*see* Tr. 1485, 1487). Notes from the first session on Tuesday, March 28th state that Plaintiff was functioning better than the previous week (Tr. 1483). She did not cry and was able to somewhat express feelings, emotions, and stressors (*Id.*). She reported that she had been in a manic state for a couple days (*Id.*).

At the second session the following day, Plaintiff reported that she had been unable to sleep due to feeling manic; she finally fell asleep that morning and slept until right before her appointment at 2:00 p.m. (Tr. 1479). When she woke up, her mood had shifted and she "was in full panic" (*Id.*). She "presented with high anxiety due to the waiting room being very full and her feeling overwhelmed" (*Id.*). She reported that she was "struggling," felt depressed, and had difficulty breathing (*Id.*). She said her family was telling her to do things to "get better," like finding a job and having a regular schedule, but those were "not options . . . at this time" because she "[could not] even think straight" (*Id.*). The clinician noted that Plaintiff was shaky and crying but her mood became more stable once she was in the office for a while (*Id.*).

At the third session on Friday, March 31st, Plaintiff presented in an anxious mood but was functioning slightly better than the two previous appointments (Tr. 1477). She did not cry during the session and was able to use logical thinking and discuss situations (*Id.*). The counselor provided encouragement for Plaintiff to remain calm over the weekend while waiting to see the psychiatrist (*Id.*). Unfortunately, she not only relapsed but was arrested for possession of drugs (*see* Tr. 1465, 1473, 1476).

She was incarcerated for a total of approximately 16 months in the county jail and the Illinois Department of Corrections (Tr. 1452). Records show that Plaintiff underwent a psychiatric diagnostic evaluation at Logan Correctional Center in September 2017 (Tr. 509–19).[6] She was not taking any psychiatric medications at the time, and she reported twice daily panic attacks where she felt dizzy and blacked out; insomnia; constant worries that were difficult to control; racing thoughts; intrusive thoughts; being constantly on guard; being easily startled; feeling tensed up and panicked; daily mood variations; having good energy and feeling in "constant overdrive" some days but feeling exhausted and "slow" other days; "horrendous" nightmares; and "locking herself in her cell due to social anxiety" (*Id.*). She also endorsed having feelings of hopelessness or helplessness, feelings of guilt or worthlessness, and low self-esteem (*Id.*). The clinician observed that Plaintiff had tensed muscles, avoided eye contact, and had a euthymic affect (*Id.*). She further noted that Plaintiff "presented as anxious in the beginning of the interview but did calm down significantly" (*Id.*). The clinician opined that Plaintiff "clearly had signs of PTSD" and anxiety (*Id.*). Plaintiff's diagnoses were recorded as PTSD, amphetamine use disorder, and adjustment disorder with anxiety, and she was started on Remeron (*Id.*). The clinician noted she would continue to closely monitor Plaintiff for possible generalized anxiety disorder, bipolar disorder, and personality disorder (*Id.*).

The following month, Plaintiff reported being "tense" and "miserable" and that

---

[6] The records from Logan Correctional Center cover only appointments with prescribing clinicians and do not cover any of Plaintiff's encounters with other mental health professionals or any counseling sessions (*see* Tr. 451–519).

the Remeron was not effective (Tr. 503–08). She said that she was on a manic high the previous week, which had subsided, and she was moving toward depression (*Id.*). The clinician observed that Plaintiff was tense, exhibiting psychomotor agitation, and had rapid speech and an expansive affect (*Id.*). The clinician noted that Plaintiff's thoughts were organized overall, but she jumped topics at times, and she was irritable but able to stay focused on the conversation (*Id.*). Plaintiff's diagnosis was changed to bipolar disorder and borderline personality disorder (*Id.*). The clinician discontinued Remeron and started Plaintiff on Risperdal to stabilize her mood and Vistaril for anxiety (*Id.*).

By November 2017, Plaintiff's medication had been switched from Risperdal to Zyprexa (*see* Tr. 496—508). She reported "doing better," and that her mood, sleep, and appetite were better (*Id.*). She said when her anxiety got high, she would take a nap (*Id.*). The clinician observed that Plaintiff was "slower," she looked rested, and her thoughts were organized (*Id.*). Plaintiff was continued on Zyprexa and Vistaril and also started on Lamictal for mood stabilization and anxiety (*Id.*).

In December 2017, Plaintiff reported severe anxiety and an inability to regulate her mood; her dosage of Zyprexa and Lamictal were both increased (Tr. 490, 494). A month and a half later in February 2018, Plaintiff reported times where her thoughts were "spinning" and "obsess[ive]" and she continued to report an inability to regulate her mood (Tr. 482–89). She said she felt like her anxiety spiked after the Lamictal was increased, she was having difficulty concentrating, and her nightmares were back (*Id.*). The clinician wrote that Plaintiff's speech was normal, her thoughts were organized, and her insight and judgment were fair (*Id.*). Plaintiff was continued on Zyprexa, the Lamictal

was decreased, and she was started on prazosin for her anxiety (*Id.*). Two weeks later, she reported "crippling" anxiety, and her medications were tweaked again (Tr. 474–81).

In April 2018, Plaintiff reported feeling emotionally flat and unable to cry or "have an up or down emotion," which she thought was due to the Lamictal (Tr. 458–65). She reported "horrible" anxiety, which the clinician noted "seems to be baseline" but was "not incapacitating as she [was] functioning well in the [general population] overall" (Tr. 458, 462). Plaintiff also reported feeling restless, but her mood, sleep, and appetite were "okay" (Tr. 458). The clinician observed that Plaintiff's speech was normal, her affect was constricted, and her insight and judgment were fair (Tr. 460, 462). The clinician discontinued the Lamictal and increased the Zyprexa (Tr. 462). Plaintiff presented two weeks later with a flat affect and monotone speech (Tr. 451).

Plaintiff was released from prison in July 2018 and was referred to Centerstone for substance abuse and mental health services as a condition of her parole (*see, e.g.,* Tr. 751, 1452). Plaintiff reported that her mental health was very unstable, and she needed to get her medications straightened out (Tr. 832; *see also* Tr. 1449–64). She said she was "not functioning at all," severely depressed, having anxiety "through the roof," and "miserable" despite being on "prison psych meds" (Tr. 1122, 1454). She reported sleeping for 15 hours at a time and said "I'm not excited about anything. I have no ambitions. I just exist" (Tr. 1454). She said her grandparents were on her because "I don't talk to anyone, I'm like a zombie" (*Id.*). She also reported having panic attacks every day, which she handled by "lay[ing] down and curl[ing] up in a ball and pray[ing] . . . [for] sleep" (*Id.*). She also said she considered "turning [her]self in to Mulberry for a few days" (*Id.*).

Shortly thereafter, Plaintiff began seeing Dr. Michael Blain for her primary care and psychiatric medications (Tr. 574). Dr. Blaine discontinued all of the medications Plaintiff had been prescribed while in prison and started her on new ones (Tr. 575). His notes from August 2018 to December 2019 consistently indicate that Plaintiff was alert, oriented, cognitively intact, cooperative and with good judgment and insight (Tr. 538–75). However, Plaintiff continually reported anxiety and, at times, panic attacks and insomnia, and Dr. Blaine continually tweaked her medications (*Id.*). But the notes rarely said anything more about Plaintiff's mental health (*see id.*).

Records from Plaintiff's counselor during this same time period provide a clearer picture about her mental health. After her medications were switched in August 2018, Plaintiff reported to her counselor that she felt she was functioning and thinking more clearly and did not feel as "slow motion" as she did on Zyprexa (Tr. 837). Her counselor noted that Plaintiff's "presentation was more connected and less stiff" than the previous session, she appeared "more calm and less panicky," and she was less fidgety and able to sit still for the majority of the session (*Id.*). Plaintiff's level of functioning continued to improve over the next several weeks (*see* Tr. 842, 845, 850).

By mid-September 2018, however, Plaintiff's mental health was slipping. On September 19th, she "presented in a distant and depressed mood," "stared in a blank way during the session[n]," and "had to be engaged a few times" (Tr. 853). Plaintiff reported that she was unable to "get motivated to do anything" and had been "distracted and overwhelmed by ongoing feelings of sadness and irritation" (*Id.*). A week later, Plaintiff was "in an anxious and apparent uncomfortable mood" and said she has been "lacking

motivation, drive, or any ambition to do anything or even get out of bed" (Tr. 858). She did not think that Klonopin was effective because she still felt anxious and unable to focus after taking it (*Id.*).

In October, Plaintiff said she felt like she had reached her breaking point (Tr. 860). Her counselor talked of Plaintiff's "current mental health crisis" and described her as being in an anxious mood and "very tearful" (*Id.*). A mental status exam a week later indicated that Plaintiff's attitude was withdrawn and preoccupied, her thought process was loose, her thought content was guarded, her mood was depressed and irritable, and her affect was sad (Tr. 1094).

Notes from November and December indicate that Plaintiff was distracted during one appointment and needed help processing her anxiety during another (Tr. 869, 871). At another appointment, she presented in an anxious mood and lamented that "she cannot get better and stay sober" while simultaneously "deal[ing] with the stress of her home" (meaning her difficult relationships with her grandparents and aunt, with whom she lived), and her daughter's difficult behaviors (Tr. 878). She said she felt like she "[had] to [choose] between being a mother and being sober because she cannot do both" (*Id.*). Plaintiff also told Dr. Blaine that her anxiety was so severe she was isolating herself from her friends and her daughter, had started clenching her jaw, and had muscle tension in her shoulders and legs (Tr. 564).

During the first part of 2019, Plaintiff presented in an average or positive mood at a handful of appointments but otherwise continued to struggle (Tr. 883, 886, 911–912, 915). Her counselor described her at times as in a "low mood," in an "angry and

frustrated mood," upset, and/or tearful (Tr. 890, 898, 909, 917–18). Plaintiff reported feeling despair, fear, anger, incompetence, and powerlessness (*Id.*). She frequently talked about her "unbearable" home life, her "emotionally overwhelming" and "hostile" relationships with her grandparents and aunt, and the difficulty of managing her daughter's behavior and the emotional distress it caused her (*Id.*). She frequently reported that she was struggling to maintain her sobriety (Tr. 890, 900, 909). And she began self-medicating with marijuana after she was released from parole; she said it helped with her mood more than any of the psychiatric medications she had tried (Tr. 909, 2269).

In May 2019, Plaintiff switched from Klonopin to Xanax, and she reported that she was functioning better with less anxiety (Tr. 924). Her counselor noted that her behavior and overall mood were positive (*Id.*). And her mental health "appeared to improve significantly" over the next month (Tr. 929). But in July 2019, Plaintiff's attendance at therapy fell off, due in part to her aunt being hospitalized and her grandparents being at the hospital, which left Plaintiff with no transportation or childcare and struggling to manage her increased responsibilities and stress (Tr. 934–48).

Plaintiff did not return to her counselor until early December 2019 (*see* Tr. 950–962). Her counselor noted that she was "very upset," and she reported having a "very difficult" time and wanting to re-engage in treatment (Tr. 962). Plaintiff told her counselor (as well as her physician) that she was dealing with multiple stressors, including the death of a close friend, her partner not being released from prison as scheduled, and her five-year-old daughter's "out of control" behavior (Tr. 538, 962). Plaintiff also admitted to relapsing and using drugs (Tr. 964–65). In mid-December 2019, Plaintiff was admitted

to the ICU due to an overdose and remained in the hospital for several days (Tr. 972; *see also* Tr. 974–81). After her discharge, she re-engaged with counseling services (Tr. 982–87). She reported increased difficulties in her relationship, high levels of emotional stress, anxiety, and substance abuse triggers (Tr. 992–95). Her counselor noted throughout January and February 2020 that Plaintiff was "markedly" symptomatic (Tr. 982–1006). Plaintiff looked into starting Medication-Assisted Treatment (MAT) with suboxone (Tr. 997–98),[7] but the psychiatrist at Centerstone would not write her a prescription (Tr. 1650–61; *see also* Tr. 1688–90).

In April 2020, Plaintiff presented at counseling sessions "very anxious and irritable" (Tr. 1026), and "very tearful" (Tr. 1041, 1044). She discussed "mood instabilities" at home, difficulty parenting her daughter, sadness and grief over separating from her partner, "up and down" emotions, "high levels" of stress, feeling overwhelmed due to her grandparents' deteriorating health and her caregiving role, nightmares she had been having, and a recent "break down" (Tr. 1032–33, 1036, 1041, 1252). At one point, she said her sadness and anxiety made her feel like giving up on being a mom and being sober (Tr. 1032). Her counselor continually noted throughout April that Plaintiff was "markedly," and even "severely," symptomatic (Tr. 1026–45).

In May 2020, there was one session where Plaintiff said she was "too emotionally overwhelmed" to participate in the session; her counselor remarked that she was

---

[7] Medication-Assisted Treatment (MAT) is the use of medications, in combination with counseling and behavioral therapies, for the treatment of substance use disorders. SUBSTANCE ABUSE AND MENTAL HEALTH SERVS. ADMIN., *Medications for Substance Use Disorders*, https://www.samhsa.gov/medications-substance-use-disorders (last visited Sept 20, 2024).

"severely symptomatic" (Tr. 1047). Another time, she said she was having a "bad day" and was "very tearful throughout the session" (Tr. 1052). She reported that she was "not functioning well in any area of her life" (Tr. 683), and expressed "very high levels of anxiety" over her relationships with her daughter, her grandparents, and her ex-partner (Tr. 1055). She said she was dealing with "lots of stress in her living situation that [made] her recovery difficult at times" (Tr. 1665). Plaintiff was up and down throughout the remainder of May and June (Tr. 1061–72; 1737–44).

During a session in July, Plaintiff's counselor noted that she was "very distracted and upset," and Plaintiff ended the session early because "her anxiety was increasing and she wanted to relax and could not work on the assessment anymore" (Tr. 1077). Her counselor remarked that she was "severely symptomatic" (*Id.*.). Later that month, Plaintiff obtained a medical cannabis card, allowing her to legally obtain marijuana to help with her anxiety and PTSD symptoms (Tr. 1278). Her counselor reflected that Plaintiff was managing her "*severe* ptsd and emotional problems" with mental health counseling and medications, and "showing progress" in working toward her treatment goals of strengthening her recovery from substances and stabilizing her mental health (Tr. 1278, 1666) (emphasis added).

In early August 2020, Plaintiff's 91-year-old grandfather, with whom she lived, filled out a Third-Party Function Report (Tr. 273–80). He stated that because of Plaintiff's condition, her hands shake, she sweats, panics, faints, and feels nauseous. Her "moods change easily depending on triggers." And she oversleeps to avoid dealing with her anxiety. In spite of her conditions, Plaintiff was able to manage her own personal care

needs (bathing, dressing, feeding, etc.). She did household chores, like laundry, vacuuming, and cleaning. She prepared meals for herself and her daughter. And she helped her daughter with everyday things, like bathing and schoolwork. But Plaintiff's grandfather said he and his wife also helped her care for her daughter and with general daily activities due to her anxiety and panic problems. Plaintiff's grandfather repeatedly stated that she spent much of her time isolating herself in her room, where she watched TV and/or scrolled Facebook. He said he only saw her at meals. She could not handle social groups. She seldom went outside, and only went shopping when necessary. She did not handle stress or changes in routine well. And she had trouble understanding and following instructions and completing tasks because she had a "difficult time focusing" and was easily overwhelmed.

It was decided in August 2020 that Plaintiff would start attending a weekly group therapy session in addition to continuing her weekly individual sessions (Tr. 1754). That month she appeared at sessions very upset and tearful (Tr. 1757, 1763). Once she was so anxious and distracted that it made completing an assessment difficult (Tr. 1779–81). She reported a recent arrest for drugs and later admitted to relapsing (Tr. 1757, 1774). But there were also times where she was feeling better and in a positive frame of mind (Tr. 1760). Nevertheless, her counselor consistently noted that she was severely symptomatic (Tr. 1754–75).

In September 2020, Plaintiff established care with Dr. Brent Jones at SIH Harrisburg Primary Care to begin MAT (*see* Tr. 2148–49; *see also* Tr. 2145–48). Dr. Jones prescribed her Suboxone and continued her prescriptions for Xanax and Seroquel (Tr.

2142–45). The following month, Plaintiff told Dr. Jones that she felt her anxiety and bipolar disorder were "well controlled on current medications" (Tr. 2132). Plaintiff likewise reported to her counselor that she was feeling better, less anxious, less stressed, and in a positive mental state (Tr. 1790–1802).

Subsequent notes tell a mixed story. Dr. Jones' notes from November and December 2020 indicate that Plaintiff was "doing quite well" and that she felt her anxiety and bipolar were well-controlled on current medications (Tr. 2112, 2125, 2128). However, other notes indicate Plaintiff was experiencing significant anxiety as a result of being investigated by DCFS for neglect (*see* Tr. 1812, 1815, 1820–21, 2123). One note in particular indicates that she was "very anxious and tearful," "in a panic," and her counselor had to assist her with breathing techniques to calm down (Tr. 1806–07). Another note describes a phone call she made to Dr. Jones's about the difficulty she was having getting her Xanax refilled; it said, "she is really stressing out over this . . . . She said she feels like she could have a relapse and she is really having a mental breakdown" (Tr. 2118).

In January 2021, Plaintiff reported to her counselor that her anxiety was "getting terrible," (Tr. 2263), and it was so high she thought she might need to be hospitalized (Tr. 2268). There was also another phone call to Dr. Jones's; office where she was "upset and crying" over an issue with getting her Xanax refilled; she was "sobbing and asking for help" (Tr. 2110). And at her appointment that month with Dr. Jones, she was "very tearful and upset" over a number of things, like the passing of her aunt, her sister being arrested, and child custody issues (Tr. 2088). She asked for a referral to a psychiatrist to get her dosage of Xanax increased (Tr. 2087, 2088). At that time, she was seeing three counselors:

her mental health counselor, a domestic violence counselor, and a sexual assault counselor (*see* Tr. 2271; *see also* Tr. 2285, 2287).

In February, Plaintiff told Dr Jones she was "doing well" on the current suboxone dosage (Tr. 2066–68). She said the same thing the next month (Tr. 2062–63). She also reported that she had recently returned to narcotics anonymous meetings and felt like her "bipolar and anxiety [were] doing quite well on current medications" (*Id.*; *see also* Tr. 2279). Dr. Jones wrote that Plaintiff's bipolar disorder was "in remission" (Tr. 2062–63). On the other hand, a March 2021 care plan from her counselor noted that Plaintiff said she had been feeling "angry and frustrated and . . . like I have no control" (Tr. 2277). She reported that her anxiety was "going up," and that although she was no longer having nightmares, she was still "very emotionally triggered" and experiencing other PTSD symptoms (Tr. 2283, 2285). She also reported she was "having a lot of problems with her sister again" and was in court over child custody issues with her ex-partner, which was "very anxiety provoking for her" and gave her "major concerns for her daughter's safety" given that her ex was also an addict and "abusive" (Tr. 2286, 2287, 2328, 2399).

Dr. Jones's notes from April indicate that Plaintiff continued to do well on current suboxone dosage, but he also acknowledged "[c]omplex social factors [were] present and complicating management" (Tr. 2058). Earlier that same day, Plaintiff had attended a consultative examination with clinical psychologist David Warshauer (Tr. 2031–35). At the beginning of the exam, Plaintiff was "very tearful, anxious, and extremely talkative to the point where [Dr. Warshauer] had to ask her to slow down and eventually to stop so that [he] could ask questions" (Tr. 2033). Dr. Warshauer noted that she was fully

oriented, had no gross psychotic symptomology, answered questions in a relevant and coherent manner, and her intelligence was at least within normal range (Tr. 2035). He also noted that Plaintiff was very anxious and tearful throughout much of the evaluation but at times was able to smile appropriately (*Id.*). Dr. Warshauer considered her anxiety level to be "far above what [he] would consider to be normal" (*Id.*).

During the agency's initial review of Plaintiff's disability application in April 2021, state agency reviewing psychologist, Dr. Margaret DiFonso, opined that Plaintiff was:

- mildly limited in her ability to understand remember or apply information;

- mildly limited in her ability to adapt or manage herself;

- moderately limited in her ability to interact with others — particularly interacting appropriately with the general public, accepting instructions, and responding appropriately to criticism from supervisors — but she was not significantly limited in any other aspect of social interaction; and

- moderately limited in her ability to maintain concentration, persistence, and pace — particularly carrying out detailed instructions and maintaining attention and concentration for extended periods — but she was not significantly limited in any other aspect of sustained concentration and persistence.

(Tr. 55–69; Tr. 70–85). In a supplemental narrative explanation, Dr. DiFonso noted that Plaintiff performed "reasonably well" on the cognitive tasks of the mental status exam conducted by Dr. Warshauer and that Plaintiff also "carrie[d] out a fair range of daily activities" (Tr. 66). According to Dr. DiFonso, that suggested Plaintiff's cognitive and attentional skills remained intact and adequate for simple one-two step as well as multi-step tasks even though her mental health symptoms and history of substance abuse

limited her ability to manage detailed tasks (Tr. 66). Dr. DiFonso also recommended "moderate limitations of social expectations" due to Plaintiff's history of personality disorder and being self-described as socially avoidant (*Id.*).

Several months later at the reconsideration stage, another state agency reviewing psychologist, Dr. Gayle Williamson, agreed with Dr. DiFonso's opinions except Dr. Williamson opined that Plaintiff was moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods (whereas Dr. DiFonso thought Plaintiff was not significantly limited) (Tr. 88–95; Tr. 96–103). Dr. Williamson stated in a supplemental narrative:

> "The [claimant] retains the mental capacity to understand, remember and concentrate sufficiently in order to carry out one or two-step instructions for a normal work period. The [claimant] could make simple work related decision. the [claimant] could interact with others sufficiently in a work setting with reduced social demands. [Claimant] would do best in a predictable, routine work setting where employment related social interactions are infrequent, brief and largely task-specific (vs. collaborative).

(Tr. 94, 101).

Medical records from Dr. Jones in May 2021 continue to note that "complex social factors [were] present and complicating management" of Plaintiff's substance abuse (Tr. 2054). Plaintiff declined to taper off her suboxone dosage and stated she wanted to continue her prescription for Xanax despite being warned about the increased risk of death with concurrent use of benzodiazepines and narcotics because she felt her anxiety "continue[d] to be well controlled on current medications" (Tr. 2054). Plaintiff's care plan

with her counselor from May 2021 also seems to reflect that she was doing relatively well, albeit not completely problem-free. She said she "[felt] more confident with less triggers," did not think about using drugs anymore, and that her mood "ha[d[ been stable for awhile now, which is why they took away my bipolar diagnosis and now I am just trying to manage my anxiety" (Tr. 2293, 2296). But she also reported that she continued to experience PTSD triggers, like "when my daughter comes at me too fast or too hard with an angry face, lots of noise, and being in a car with any male" (Tr. 2299).

In June 2021, Plaintiff reported to Dr. Jones that she had been under a lot of stress and her craving for opiates had increased; Dr. Jones agreed that her dosage of suboxone needed to be increased (Tr. 2050). Her anxiety, however, was "overall okay," and her prescription for Xanax was continued (Tr. 2050; *see also* Tr. 2047). A note from Plaintiff's counselor corroborates that she had been very stressed in recent weeks but also reported "many healthy, sober activities . . . recently," like going to the pool and a baseball game with her daughter and going hiking with a friend (Tr. 2519). Plaintiff told her case manager that she had been contemplating getting a job (Tr. 2516–17, 2525).

In July 2021, Dr. Jones wrote that Plaintiff was "doing quite a bit better" and she felt her anxiety was "well-controlled" (Tr. 2041). She wanted to continue the current medication regime and did not want to taper the suboxone dosage or discontinue the Xanax (*Id.*). Notes from Plaintiff's counselor similarly indicate that Plaintiff was "doing much better mentally and emotionally" (Tr. 2499; *see also* Tr. 2503–04, 2509). The situation with DCFS had been resolved in her favor, resulting in her being a lot less stressed every day, in a better mood, with improved functioning levels (Tr. 2503–04).

Plaintiff continued doing well into the fall. She told Dr. Jones in September 2021 that "her anxiety is doing well. Things are going well with her family. Overall she feels she is doing the best she has done in a long time" (Tr. 2600). Plaintiff's counselor wrote that her continued sobriety had led to improvements in her mood, functioning, and overall happiness (Tr. 2480–81). A care plan from October 2021 indicates that although Plaintiff's anxiety was "still really high" and she still experienced PTSD triggers, she was "doing a lot better" thanks to counseling (Tr. 2327, 2330). As for her substance abuse problems, Plaintiff was stable in the MAT program on suboxone (Tr. 2324). Her counselor continued to assess her as "moderately" and "markedly" symptomatic but also "much improved" since she started treatment at Centerstone (Tr. 2447, 2458, 2465, 2481–82).

Dr. Jones's notes through the end of 2021 and the beginning of 2022 indicate that while Plaintiff had moments of feeling depressed or very stressed (*e.g.*, Tr. 2615), she was generally doing "okay" and managing her mental health with medication and counseling (Tr. 2615, 2627, 2635).

At the hearing in March 2022, the ALJ asked Plaintiff what problems she was having that impeded her ability to work (Tr. 37). Plaintiff responded that she is extremely hypervigilant and startled easily (Tr. 37, 43–44). Her anxiety makes her nauseous and completely overwhelmed by simple things, like checking her mailbox or filling out paperwork (Tr. 37, 38). She said most days she stays in bed and tries to sleep longer to avoid her anxiety (Tr. 37), which echoed what her grandfather had previously said. Plaintiff also said "everything's scattered" and her brain "goes about 20 different directions" (*Id.*). When she tries to focus on a thought, about twenty more come at her

(*Id.*). Due to the trauma she's experienced in her life, she is highly sensitive to raised voices and people "getting offensive" or even talking in a stern voice (*Id.*). And she constantly questions herself—whether she's good enough, whether she's overstepping bounds, whether she made the right decision, whether she's doing something wrong, etc. (Tr. 38). Plaintiff also said that she has panic attacks, including a "big one" every couple weeks, where she either throws up or passes out (Tr. 43).

The ALJ then asked Plaintiff what her typical day looked like (Tr. 39). Plaintiff said she gets up and helps her daughter get ready for school (*Id.*). Once her daughter leaves, she lays back down and tries to go back to sleep to avoid feeling her anxiety (*Id.*). She makes meals for herself and her daughter, although her anxiety is so bad that she usually cannot eat anything until about 3:00 in the afternoon (Tr. 39–40). She does housework but her sister sometimes helps (Tr. 40). She does her own grocery shopping but not without difficulty remembering what she needs, keeping track of her list, etc. (*Id.*). It usually takes her three or four trips before she finally has everything she needs (*Id.*).

Plaintiff testified that for a while she would go to the gym for exercise, but after a while "it was like I couldn't force myself to get up and do it anymore" (Tr. 40–41). She said it is really hard for her to keep any kind of routine, even if it is just getting out of the house for a bit everyday (Tr. 41). She does not have any friends, and she described herself as "extremely isolated" (Tr. 41, 42). She spends most of her time "alone, and quiet, with Netflix" (*Id.*). Sometimes she scrolls Facebook because it's a good escape from reality (*Id.*).

Once Plaintiff was finished testifying, the ALJ questioned the vocational expert ("VE") about jobs a hypothetical claimant with limitations similar to Plaintiff could

perform (Tr. 46–49). The ALJ began by asking whether jobs existed for a hypothetical claimant who:

> Was able to perform the full range of work with no exertional limitations . . . [but was] limited to being able to understand, remember, and carry out simple instructions for simple tasks on a sustained basis, in a predictable, routine work setting, requiring no more than occasional brief interactions with coworkers, supervisors, and the general public for purposes of performing simple work tasks, and where social interaction is largely task-specific, as opposed to collaborative.

(Tr. 46–47). The ALJ indicated that jobs existed for such a person, such as floor waxer, industrial cleaner, and marker (Tr. 47). The same three jobs would remain even if the hypothetical person had a greater social restriction and could tolerate no more than incidental interaction with the general public (Tr. 48). But if the hypothetical person would be off task approximately 15 percent of the workday, or absent from work three or more days per month, on a sustained basis, then they were unemployable (*Id.*).

## THE ALJ'S DECISION

To qualify for DIB or SSI, a claimant must prove that they became disabled within the meaning of the applicable statutes and regulations. 42 U.S.C. § 423(a)(1); 42 U.S.C. § 1382a(a)(1); 20 C.F.R. §§ 404.315, 416.202.[8] Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to

---

[8] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, *et seq.*, and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, *et seq.*, and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes and regulations are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, of the DIB regulations. Most citations herein are to the DIB statutes and regulations out of convenience.

result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

Here, ALJ Martin followed the familiar five-step sequential analysis to determine that Plaintiff was not disabled (Tr. 13–24). *See* 20 C.F.R. §§ 404.1520 (evaluation of disability in general); *Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021) (describing the five steps). At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of June 1, 2013 (Tr. 13, 15). At step two, the ALJ found that Plaintiff's severe impairments included generalized anxiety disorder, posttraumatic stress disorder, major depressive disorder, bipolar disorder, borderline personality disorder, and substance abuse (Tr. 15).

At step three, the ALJ determined that none of Plaintiff's impairments, either alone or in combination, met or medically equaled a listed impairment,[9] however, Plaintiff had "moderate limitations" in all four areas of mental functioning used in a work setting: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself (Tr. 16–17). *See* 20 C.F.R. § 404.1520a(c); 20 C.F.R. Pt. 404, Subpt. P, App. 1, Pt. A2, § 12.00(A)(2)(b).

The ALJ then assessed Plaintiff's residual functional capacity ("RFC") and found that, despite her limitations and psychiatric impairments, Plaintiff retained the ability to

---

[9] The ALJ considered Listing 12.04 for depressive, bipolar and related disorders, 12.06 for anxiety and obsessive-compulsive disorders, 12.08 for personality and impulse-control disorders, and 12.15 for trauma- and stressor-related disorders (Tr. 16). 20 C.F.R. Pt. 404, Subpt. P, App. 1, Pt. A2, §§ 12.00(B)(3), (5), (7), (11); 12.04; 12.06; 12.08; 12.15.

perform a full range of work at all exertional levels except that she was limited to "simple tasks on a sustained basis in a predictable, routine work setting" with only occasional, brief, and largely task-specific interactions with co-workers, supervisors, and the general public for purposes of performing simple work tasks (Tr. 17).

At step four, the ALJ concluded that based on her RFC, Plaintiff could no longer perform any of her past relevant work as a fast-food worker (Tr. 22). At step five, the ALJ determined that, based on the testimony of the VE, there were jobs that Plaintiff could have performed, including floor waxer, industrial cleaner, and marker (Tr. 23). Therefore, Plaintiff was not disabled.

## ISSUES RAISED BY PLAINTIFF

1. Whether the ALJ erred by failing to account for Plaintiff's moderate limitations in concentration, persistence, and pace when assessing her RFC?

2. Whether the ALJ erred by failing to account for the moderate "check-box" limitations found by the State Agency reviewing psychologists in accepting instruction and responding appropriately to criticism?

3. Whether the ALJ erred by providing inadequate reasons for discounting Plaintiff's subjective statements about her symptoms, particularly when it came to her daily activities?

## DISCUSSION

The scope of judicial review is limited to determining whether the ALJ applied the correct legal standard in reaching their decision, whether the ALJ's decision is supported by substantial evidence, and whether the ALJ "buil[t] an accurate and logical bridge from the evidence to [their] conclusion" that the claimant is not disabled. *Jeske v. Saul*, 955 F.3d 583, 587 (7th Cir. 2020) (internal citations omitted). In other words, "the ALJ must explain

[their] decision in such a way that allows [the court] to determine whether [they] reached [their] decision in a rational manner, logically based on [their] specific findings and the evidence in the record." *McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011). The court reviews the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021). The ALJ's decision will be reversed "only if the record compels a contrary result." *Deborah M.*, 994 F.3d at 788 (internal quotation marks and citation omitted).

All of Plaintiff's arguments relate to the ALJ's formulation of her RFC. A claimant's RFC is "the maximum that a claimant can still do despite [their] mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675–76 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(1)). The ALJ must determine the claimant's RFC based on "all the relevant evidence in [the] case record," which includes objective medical evidence, statements from medical sources, the claimant's own statements about symptoms and limitations, and statements from non-medical sources, like family, friends, neighbors, etc. 20 C.F.R. § 404.1545(a)(1), (3); *see also Craft*, 539 F.3d at 676; Social Security Ruling 96-5p, 1996 WL 374183, at *5 (July 2, 1996). And the ALJ must explain how the RFC accounts for and accommodates the claimant's limitations and how the evidence in the record supports the RFC. *See Martin v. Saul*, 950 F.3d 369, 374 (7th Cir. 2020) ("[T]he ALJ must account for the totality of a claimant's limitations in determining the proper RFC.") (internal quotation marks and citation omitted); *Ghiselli v. Colvin*, 837 F.3d 771, 779 (7th Cir. 2016) (ALJ must "build a logical bridge from the medical evidence to its conclusions regarding

. . . [any] limitation attendant to its residual functional capacity determinations."); *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011) (ALJ must "explain how she reached her conclusions about [claimant's] physical [and/or mental] capabilities.") (citation omitted); Social Security Ruling 96-8p ("SSR 96-8p"), 1996 WL 374184, at *7 (July 2, 1996) ("The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion . . . .").

"[A]lthough an ALJ does not need to discuss every piece of evidence in the record, the ALJ may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it. The ALJ must confront the evidence that does not support her conclusion and explain why that evidence was rejected." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014). *See also* SSR 96-8p, 1996 WL 374184, at *7.

## A.  Failure to Account for Moderate Limitation in Concentration, Persistence, and Pace

Plaintiff first argues that neither the hypothetical the ALJ posed to the VE nor the ALJ's RFC determination properly accounted for her moderate limitations in concentration, persistence, and/or pace (Doc. 19, pp. 8–11). She contends that the evidence shows she requires additional off-task time or unscheduled breaks, but the ALJ rejected such a restriction without a sufficient explanation or properly considering the evidence in the record (*Id.*). The Court agrees.

Concentration, persistence, or pace "refers to the abilities to focus attention on work activities and stay on task at a sustained rate." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Pt. A2, § 12.00(E)(3). This area of mental functioning includes, for example, "performing a task that you understand and know how to do; working at an appropriate and

consistent pace; completing tasks in a timely manner; ignoring or avoiding distractions while working; . . . sustaining an ordinary routine and regular attendance at work; and working a full day without needing more than the allotted number or length of rest periods during the day." *Id.*

As a general rule, both the hypothetical posed to the VE and the RFC assessment "must account for the 'totality of a claimant's limitations,'" including even moderate limitations in concentration, persistence, or pace. *Martin*, 950 F.3d at 374 (citing *Moreno v. Berryhill*, 882 F.3d 722, 730 (7th Cir. 2018)); *Lothridge v. Saul*, 984 F.3d 1227, 1233 (7th Cir. 2021) (quoting *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019)). When posing hypotheticals to the VE, "as a matter of form," the ALJ need not use the precise phrase "concentration, persistence and pace." *Crump*, 932 F.3d at 570 ("[T]here is no magic words requirement."). But "[a]s a matter of substance . . . the ALJ must ensure that the VE is 'apprised fully of the claimant's limitations' so that the VE can exclude those jobs that the claimant would be unable to perform." *Id.* (quoting *Moreno*, 882 F.3d at 730). The "best" and "most effective" way to ensure that the VE knows the full extent of a claimant's limitations in concentration, persistence, and pace is to expressly include the limitation in the hypothetical, but again, there is no firm requirement that the ALJ do so. *Crump*, 932 F.3d at 570 (citing *Moreno*, 882 F.3d at 730); *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010). When it comes to the RFC finding, the Seventh Circuit has likewise emphasized that "the ALJ generally may not rely on catch-all terms like 'simple, repetitive tasks' because there is no basis to conclude that they account for problems of concentration, persistence, or pace." *Crump*, 932 F.3d at 570.

Here, at Step Three, the ALJ determined that Plaintiff's mental impairments caused moderate limitations in concentration, persistence, and pace (Tr. 16). In particular, "[t]he record revealed that [Plaintiff] had demonstrated difficulties with the ability to focus." (*Id.*). The ALJ also found the state agency reviewing psychologists' findings "generally persuasive," including that Plaintiff was moderately limited in her ability to maintain concentration for extended periods as well as her ability to complete a normal workday/week without interruptions from her symptoms and to work at a consistent pace without taking additional breaks (Tr. 22; *see also* Tr. 64, 101). The ALJ seemed to account for Plaintiff's problems with concentration, persistence, and pace in the third hypothetical when he asked the VE to consider a person who would be off task for 15% of the workday (Tr. 48).[10] *See Winsted v. Berryhill*, 923 F.3d 472, 477 (7th Cir. 2019). The VE responded that the individual would not be able to sustain employment. But the ALJ did not reference this opinion in his decision or impose any corresponding concession for being off-task or taking extra breaks (*see* Tr. 17–22).

Rather, the ALJ's decision relies on the first hypothetical, which asked about the availability of work for someone who could perform "simple tasks" in "a predictable, routine work setting" with only occasional, brief, task-oriented interactions with others (*see* Tr. 17; Tr. 46–47). But the Seventh Circuit has repeatedly explained that in most cases these exact specifications—simple, routine tasks with limited interactions with others— will not adequately account for problems with concentration, persistence, and pace.

---

[10] It is unclear to the Court, however how the ALJ came up with the 15% figure. *See Lanigan* 865 F3d at 563.

*Winsted*, 923 F.3d at 477 (citing *O'Connor-Spinner*, 627 F.3d at 620). *Accord DeCamp v. Berryhill*, 916 F.3d 671, 676 (7th Cir. 2019) ("[W]e have 'repeatedly rejected the notion that . . . confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace.'") (quoting *Yurt v. Colvin*, 758 F.3d 850, 858–59 (7th Cir. 2014)).

By way of explanation, the term "simple tasks" refers to "unskilled work," meaning tasks that that are not complex and do not take long to learn. *Martin*, 950 F.3d at 373; *Varga v. Colvin*, 794 F.3d 809, 814 (7th Cir. 2015); 20 C.F.R. § 404.1568 ("Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time[,]" usually within 30 days). But "the relative difficulty of a specific job assignment does not necessarily correlate with a claimant's ability to stay on task . . . ." *Martin*, 950 F.3d at 373. As the Seventh Circuit has "repeatedly cautioned . . . 'someone with problems concentrating might not be able to complete a task consistently over the course of a workday, no matter how simple it may be.'" *Lothridge*, 984 F.3d at 1233 (quoting *Martin*, 950 F.3d at 373–74 (collecting cases)).[11]

Additionally, a "routine work setting" (meaning a workplace with few, if any, changes) and minimal social interactions are restrictions that "dea[l] largely with workplace adaptation, rather than concentration, pace, or persistence." *Varga*, 794 F.3d at

---

[11] *Accord Crump*, 932 F.3d at 570 ("observing that a person can perform simple and repetitive tasks says nothing about whether the individual can do so on a sustained basis . . . over the course of a standard eight-hour work shift."); *Mischler v. Berryhill*, 766 Fed. Appx. 369, 376 (7th Cir. 2019) ("A task can be simple, but a person with a poor attention span may still become distracted and stop working."); *O'Connor-Spinner*, 627 F.3d at 620 ("The ability to stick with a given task over a sustained period is not the same as the ability to learn how to do tasks of a given complexity.").

815. *See also Radosevich v. Berryhill*, 759 Fed. Appx. 492, 494 (7th Cir. 2019) (restriction to "few, if any, workplace changes" reflected claimant's abilities to cope with changes); *Yurt*, 758 F.3d at 855, 859 (limitation regarding number and scope of social interactions accounted for claimant's difficulties in social functioning); *Hofslien v. Barnhart*, 172 Fed. Appx. 116, 120 (7th Cir. 2006) (limiting social contact with supervisors, co-workers, and the public "reflected [claimant's] moderate restrictions in social functioning").

In this instance, the ALJ did not articulate how limiting Plaintiff to simple tasks in a routine setting with limited social interaction correlates with, or was meant to accommodate, Plaintiff's particular problems with concentration, persistence, or pace (*see* Tr. 17–22). Nor is it readily apparent to the Court. It is not as if the record shows Plaintiff only struggled to focus in response to situational stressors, like being faced with a complex task or being around other people.[12] The ALJ also did not indicate how the evidence supported his belief that Plaintiff was able to stay on task at a sustained pace for at least 85% of the workday and did not need additional off-task time or unscheduled breaks (*see id.*). Absent from the ALJ's decision is any explanation as to how a person with Plaintiff's acknowledged problems in concentration, persistence, and pace could perform

---

[12] *But see Bruno v. Saul*, 817 Fed. Appx. 238, 242 (7th Cir. 2020) (holding RFC finding and hypothetical limiting claimant to simple routine tasks and simple work-related decisions accounted for CPP problems where the evidence showed claimant struggled to concentrate only when the assignment at hand was complex); *Jozefyk* v. Berryhill, 923 F.3d 492, 498 (7th Cir. 2019) (holding hypothetical restricting claimant to simple, routine, repetitive tasks with limited social interaction adequately accounted for CPP limitations because medical evidence showed claimant's psychological "impairments surface only when he [was] with other people or in a crowd"). *See also Winsted*, 923 F.3d at 477 (court unable to say RFC minimizing social interaction accounted for CPP difficulties where evidence showed claimant experienced symptoms even when he was not around other people).

at the level described in the RFC (*see* Tr. 17–22). Accordingly, the ALJ did not sufficiently

connect the dots between the RFC he found and the deficits that he also acknowledged,

which leaves the Court unable to assess the validity of the ALJ's ultimate finding.

Furthermore, because the flawed RFC was used as the basis for the first

hypothetical question to the VE, it is not clear that the VE's testimony is reliable. The first

hypothetical question did not explicitly note that Plaintiff was moderately limited in

concentration, persistence, and pace. Nor did it describe Plaintiff's underlying mental

conditions[13] or use any alternative terminology or phrasing that could have accounted

for Plaintiff's limitation.[14] And there is no evidence that the VE had reviewed Plaintiff's

medical records or was otherwise familiar with Plaintiff's specific limitations. [15]

---

[13] *See O'Connor-Spinner*, 627 F.3d at 620 (ALJ excused from explicitly mentioning CPP limitations when hypothetical describes claimant's underlying mental conditions, and it is apparent and obvious those conditions would cause CPP limitations). *See also Simila v. Astrue*, 573 F.3d 503, 521–22 (7th Cir. 2009) (approving of hypothetical that omitted specific mention of CPP limitations because it stated that claimant suffered from chronic pain syndrome and somatoform disorder, which obviously caused pain, and pain was the root of claimant's CPP problems).

[14] *See Lanigan v. Berryhill*, 865 F.3d 558, 565 (7th Cir. 2017) (ALJ excused from explicitly addressing CPP limitations when hypothetical otherwise accounts for the limitations with different terminology); *O'Connor-Spinner*, 627 F.3d at 619 ("We also have let stand an ALJ's hypothetical omitting the terms 'concentration, persistence and pace' when it was manifest that the ALJ's alternative phrasing specifically excluded those tasks that someone with the claimant's limitations would be unable to perform."). *See also Winsted*, 923 F.3d at 477 (explaining hypothetical about individual who would be off task 20% of workday or would have two unscheduled absences per month seemingly "ha[d] in mind someone with 'moderate difficulties with concentration, persistence, and pace.'"); *Sims v. Barnhart*, 309 F.3d 424, 427, 431–32 (7th Cir. 2002) (finding VE's inquiry into low-stress, uncomplicated work accounted for limitations arising partly from panic disorder); *Johansen v. Barnhart*, 314 F.3d 283, 285, 288–89 (7th Cir. 2002) (approving of hypothetical limiting claimant to "repetitive, low-stress" work because that description excluded positions likely to trigger symptoms of the panic disorder at the root of the claimant's moderate CPP limitations).

[15] *See Lanigan*, 865 F.3d at 565 (ALJ excused from explicitly addressing CPP limitations in hypothetical when VE has independently reviewed claimant's medical record or heard testimony about their limitations). *But see O'Connor-Spinner*, 627 F.3d at 619 (noting "[t]his exception to the general rule . . . does not apply where . . . the ALJ poses a series of increasingly restrictive hypotheticals to the VE, because in such cases we infer that the VE's attention is focused on the hypotheticals and not on the record.").

Consequently, the Court cannot say whether the VE's response to the first hypothetical took into account Plaintiff's limitations in concentration, persistence, or pace and eliminated positions that she would be unable to perform. In other words, the Court is not assured that the VE's testimony constitutes substantial evidence of the jobs Plaintiff could do. Therefore, the conclusion that Plaintiff could perform other work in the economy cannot stand. *O'Connor-Spinner*, 627 F.3d at 620. *See Crump*, 932 F.3d at 570–71 (reversing where ALJ's RFC assessment was rooted in hypothetical that "asked only about the availability of work for someone who could perform simple, repetitive tasks without incorporating any CPP limitations"); *Winsted*, 923 F.3d at 477 (same).

The Commissioner contends that the hypothetical and mental RFC were tied to the evidence in the record—specifically medical records and the state agency reviewing psychologists' opinions—thereby suggesting that the ALJ's decision was supported by substantial evidence (Doc. 25, p. 5). However, the Court is not persuaded.

With respect to the medical records, the ALJ's decision recites information from the records, but it does not articulate how the records supported the ultimate determination that Plaintiff could stay on task for an entire workday. Furthermore, only a select portion of the records are summarized; the ALJ did not engage with large swaths of records that would seem to undermine the conclusion that Plaintiff could stay on task for an entire workday (*see* Tr. 17–22). *See Lothridge*, 984 F.3d at 1234 ("An ALJ need not address every piece of evidence, but she may not ignore entire swaths of it that point toward a finding of disability.") (citation omitted).

To begin with, the ALJ's discussion of Plaintiff's medical records began with her

psychiatric hospitalization in April 2016 (*see* Tr. 18–22), but her alleged disability onset date was almost three years prior. The ALJ did not engage with any of the records from this time period from Plaintiff's counselor at Centerstone or her primary care physician (*see* Tr. 13–24). Nor is there any mention of Plaintiff's treatment records from Centerstone in March 2017 (*see id.*). All of these records contain significant information regarding Plaintiff's mental health issues. *See supra* pp. 3–6, 7–9.

With respect to Plaintiff's psychiatric records from prison, the ALJ only discussed the final treatment note before Plaintiff's release from prison, when her mental status exam was largely normal (Tr. 20; *see* Tr. 451–57). He did not mention any of the other notes from Plaintiff's (at least) eight-month course of mental health treatment, which describe Plaintiff's impaired mental functioning. *See Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) (having "symptoms that 'wax and wane' [is] not inconsistent with a diagnosis of recurrent, major depression"); *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008) (a claimant with a chronic disease like bipolar disorder "is likely to have better days and worse days"); *Kangail v. Barnhart*, 454 F.3d 627, 629 (7th Cir. 2006) (a patient's normal behavior during office visit does not contradict a finding of severe mental illness).

Dr. Michael Blaine prescribed Plaintiff psychotropic medications for almost two years; but the ALJ's decision only mentions one note from Dr. Blaine that ultimately said very little about Plaintiff's mental health (Tr. 20; *see* Tr. 534–37; *see also* Tr. 530–75). The record also indicates that Plaintiff treated with a counselor at Centerstone following her release from prison for three-and-a-half years. However, the ALJ's decision only discusses two records from those years of treatment notes and the two records discussed

provided little information about Plaintiff's mental health over the course of her treatment at Centerstone (*see* Tr. 17–22).

Many of the records the ALJ did not engage with appear to support Plaintiff's contention that she has serious trouble concentrating and remaining on task. They show she consistently reported symptoms, including but not limited to, hypervigilance and being easily startled; racing, scattered, and intrusive thoughts; being easily overwhelmed; panic attacks; diminished interest in activities; and lack of motivation (*e.g.,* Tr. 331, 333, 359, 371, 486, 503, 509, 513–14, 683, 753, 853, 858, 1005, 1624). Providers likewise consistently observed signs such as emotional instability; anxiousness; sad or depressed mood; distant or preoccupied mood; frustrated, angry, irritable mood; tearfulness; psychomotor agitation; rapid speech; and extreme talkativeness (*e.g.,* Tr. 505, 507, 509, 853, 858, 869, 890, 909, 918, 1005, 1026, 1041, 1625, 2033). And there were times where Plaintiff could not stay focused and/or engaged for an entire appointment (*e.g.,* Tr. 853, 1047, 1077, 1487, 1781). The ALJ's decision did not meaningfully engage with this evidence or reconcile it with the ultimate conclusion that Plaintiff did not require flexibility for off-task time or unscheduled breaks. *See Moore*, 743 F.3d at 1123 (ALJ "must confront the evidence that does not support her conclusion and explain why that evidence was rejected.").

As for the state agency reviewing psychologists' opinions, the Commissioner claimed the ALJ "considered" these opinions and then merely recited what the ALJ had to say about them (Doc. 25, p. 7; *see also* Tr. 22). The Commissioner did not develop any argument or cite to any case law (*see* Doc. 25, p. 7). Accordingly, the Court considers the

Commissioner to have waived any argument that the agency psychologists' opinions constitute substantial evidence sufficient to uphold the RFC assessment.

However, for the sake of completeness, the Court will briefly discuss the issues regarding these opinions. Both of the agency psychologists opined that Plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods (Tr. 64, 101). The agency psychologist at the reconsideration level also opined that Plaintiff was moderately limited in her ability to complete a normal workday/workweek without interruption from her psychological symptoms and to perform at a consistent pace without needing additional breaks (Tr. 101). Despite identifying these "check-box" limitations for Plaintiff, neither psychologist imposed any restriction related to time off-task or extra breaks in their narrative RFC assessments (Tr. 64-66, 101-02). And neither psychologist provided a cogent explanation as to why such a restriction was not needed (*see id.*). Consequently, the Court cannot say that the psychologists' narrative assessments are consistent with their check-box limitations, as the Commissioner contends (Doc. 25, p. 8). *See Varga*, 794 F.3d at 816 ("ALJ may rely on a doctor's narrative RFC, rather than the checkboxes, where that narrative adequately encapsulates and translates those worksheet observations."). The ALJ's decision, which seemed to accept the state agency psychologists' opinions that Plaintiff can work at a sustained pace for an entire workday as true, did not articulate why a restriction related to time off-task or extra breaks was not necessary.

Even if it was acceptable for the ALJ to rely on the agency psychologists' narrative explanations in formulating Plaintiff's RFC, when it came to posing hypotheticals to the

VE, the ALJ was still required to "adequately account for limitations identified . . . in [the] check-box sections of standardized forms . . . ." *DeCamp*, 916 F.3d at 676 (citing *Yurt*, 758 F.3d at 859). But the first hypothetical posed to the VE incorporated only the limitations expressly contained in the agency psychologists' narratives and did not give the VE any basis to evaluate Plaintiff's impairments in concentration, persistence, and pace identified in the "check box" portion of the forms, which warrants reversal. *DeCamp*, 916 F.3d at 676; *Yurt*, 758 F.3d at 859. *See also Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2003) ("[T]o the extent the ALJ relies on testimony from a vocational expert, the question posed to the expert must incorporate all relevant limitations from which the claimant suffers.").

In sum, for all of the reasons outlined above, the ALJ's assessment of Plaintiff's RFC falls short. The ALJ's determination that jobs existed that Plaintiff could perform likewise falls short because it relied on the VE's response to the first hypothetical question, which was based on the flawed RFC. Consequently, the Court concludes that ALJ's decision finding that Plaintiff was not disabled is not supported by sufficient explanation or substantial evidence, and therefore must be reversed.

Although the Court need not explore in detail the remaining errors claimed by Plaintiff, the Court will briefly discuss Plaintiff's arguments.

### B. Social Limitations Pertaining to Supervisors

In Plaintiff's second argument, she claims that the ALJ failed to account for her moderate limitations in accepting instructions and responding appropriately to criticism from supervisors (Doc. 19, pp. 11–14). Specifically, both of the state agency reviewing

psychologists opined that Plaintiff was moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors (Tr. 65, 93).

It seems as though the ALJ credited these opinions, and the ALJ imposed "more specific social limitations" than either agency psychologist advocated for (Tr. 22), namely that he restricted Plaintiff to occasional, brief, task-oriented interactions with supervisors (as well as coworkers and the general public) (Tr. 17). But there is no explanation as to how these restrictions actually accounted for and accommodated Plaintiff's limitations in accepting instructions and responding appropriately to criticism (*see* Tr. 17–22). And it is not clear that they do; as Plaintiff said, it is entirely possible that even "occasional" and "brief" interactions with supervisors would include some element of instruction or criticism to which she would respond poorly (Doc. 28, p. 6). This omission is important because "[a]s the Commissioner has explained before, even a moderate limitation on responding appropriately to supervisors may undermine seriously a claimant's ability to work." *O'Connor-Spinner*, 627 F.3d at 621 (citing 20 C.F.R. § 404.1545(c)). *See also* Social Security Ruling 85-15, 1985 WL 56857, at *6 (Jan. 1, 1985) ("[A]n individual who cannot tolerate being supervised may not be able to work even in the absence of close supervision; the *knowledge* that one's work is being judged and evaluated, even when the supervision is remote or indirect, can be intolerable for some mentally impaired persons.").

Accordingly, the Court encourages the ALJ to clarify his position on remand, although the omission, standing alone, might not have supported a remand.

## C.  Evaluation of Plaintiff's Subjective Statements About Her Symptoms

In his written decision, the ALJ indicated that he believed Plaintiff's psychological impairments caused a variety of symptoms, but he thought that Plaintiff's "statements concerning the intensity, persistence, and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record" (Tr. 18). In other words, the ALJ did not believe Plaintiff's symptoms were as bad as she said they were. Plaintiff claims that the ALJ erred by not adequately explaining his reasons for discounting her statements about her symptoms, particularly when it came to her daily activities (Doc. 19, p. 14).

Once the ALJ has determined there is an underlying mental impairment that could reasonably be expected to produce an individual's symptoms, the ALJ must then evaluate the intensity and persistence of those symptoms to determine the extent to which they limit the claimant's ability to perform work-related activities. Social Security Ruling 16-3p ("SSR 16-3p"), 2017 WL 5180304, at *4, 5 (Oct. 25, 2017); 20 C.F.R. 404.1529(c)(1). In doing so, the ALJ must examine *the entire case record*, beginning with the objective medical evidence. SSR 16-3p, 2017 WL 5180304, at *4, 5; 20 C.F.R. 404.1529(c)(1), (2), (3). If the objective medical evidence does not fully substantiate the claimant's subjective statements about the severity of their symptoms, then the ALJ must consider whether the claimant's statements are consistent with the other medical and non-medical evidence in the record, particularly as it relates to the claimant's daily activities; the duration, frequency, and intensity of the claimant's symptoms; things that precipitate or aggravate the symptoms; the claimant's medications; and other treatments or measures used to alleviate the symptoms. SSR 16-3p, 2017 WL 5180304, at *6–7, 7–8; 20 CFR 404.1529(c)(3).

An ALJ's findings concerning the intensity, persistence, and limiting effects of a claimant's symptoms must be explained sufficiently and supported by substantial evidence. *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015); *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009). So long as the ALJ issues a reasoned explanation, the credibility determination is afforded "considerable deference" and will be overturned only if it is "patently wrong." *Ray v. Berryhill*, 915 F.3d 486, 490 (7th Cir. 2019) (quoting *Terry*, 580 F.3d at 477). *See also Getch v. Astrue,* 539 F.3d 473, 483 (7th Cir. 2008) ("Reviewing courts . . . should rarely disturb an ALJ's credibility determination, unless that finding is unreasonable or unsupported."). "Patently wrong is a high threshold—'only when the ALJ's determination lacks any explanation or support . . . will [we] declare it to be patently wrong and deserving of reversal.'" *Ray v. Saul*, 861 Fed. Appx. 102, 107 (7th Cir. 2021) (quoting *Elder v. Astrue*, 529 F.3d 408, 413–14 (7th Cir. 2008)).

The Court agrees with Plaintiff that the ALJ did not sufficiently explain his reasons for discounting her statements about her symptoms. As an initial matter, the Court is unsure which of Plaintiff's statements the ALJ was using as his basis for comparison. There is little reference to her testimony in the decision; it simply notes that Plaintiff testified she had previously worked at a steakhouse and as a fast-food worker, and "alleged significantly limited activities of daily living, due to anxiety" (Tr. 18). The ALJ also did not provide any comprehensive summary of the symptoms Plaintiff said she experienced (*see* Tr. 13–24); there are only scattered references to a couple of her symptoms (*e.g.*, Tr. 16 (difficulty staying focused); Tr. 19 (panic attacks)).

The ALJ's decision did not meaningfully explain the determination that Plaintiff's

reports to physicians, and the physicians' objective findings, were inconsistent with her testimony about significant dysfunction (Tr. 18; *see* Tr. 17–22). The discussion is merely a recitation of information from Plaintiff's medical records and does not indicate or explain which information supports his determination (*see* Tr. 18–22). While some of it appears to support his decision, there is plenty that does not. As one example, the ALJ wrote that "[t]he record revealed that her anxiety was well controlled,"[16] but later in the same paragraph, the ALJ recounted the consultative examiner's opinion that Plaintiff's "anxiety level was far above what was considered to be normal." (Tr. 18). There is no explanation from the ALJ why the evidence that tended to show Plaintiff was doing well outweighed the contrary evidence (*see id.*). *O'Connor-Spinner*, 627 F.3d at 621 ("An ALJ must explain why he does not credit evidence that would support strongly a claim of disability, or why he concludes that such evidence is outweighed by other evidence.").

The ALJ's decision does not discuss the duration, frequency, and intensity of Plaintiff's symptoms or the things that triggered her symptoms (*see* Tr. 17–22). With regard to Plaintiff's medications, the ALJ's decision says only that Plaintiff was "doing well on medications (i.e., Suboxone)" (Tr. 18). But at the time of the hearing, Plaintiff was also prescribed Xanax to help with her anxiety and Seroquel to help her sleep at night,

---

[16] The Court notes that the evidence the ALJ cited to in support of his statement that Plaintiff's anxiety was well-controlled was 16 pages of records from three appointments with her primary care physician between late-July 2021 to early-October 2021 (Tr. 18 (citing 12F); *see* Tr. 2593–2608). But as the Seventh Circuit has observed, "a person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about her overall condition." *See Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011). *See also Bauer*, 532 F.3d at 609 ("A person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days . . ." and even if she is well enough to work half of the time, "[t]hen she could not hold down a full-time job.").

and she used marijuana (Tr. 39). There is also no recognition that Plaintiff had spent years cycling through numerous medications at different times and in different combinations (including venlafaxine, Zoloft, Abilify, Remeron, Ambien, Restoril, Latuda, Depakote, Ativan, Risperdal, Vistaril, Zyprexa, Lamictal, Prazosin, Tegratol, Klonopin, and Seroquel) in an attempt to find something that adequately controlled her psychological symptoms. And the ALJ did not acknowledge the numerous notes where Plaintiff reported her medications were not working or that she had severe or worsening symptoms in spite of the medications, sometimes to the point she had to be hospitalized (*see, e.g.,* Tr. 1625). Thus, there is significant evidence in the record regarding Plaintiff's medications that tends to support her contentions, but which the ALJ's decision does not confront or reconcile. *Mandrell v. Kijakazi*, 25 F.4th 514, 518 (7th Cir. 2022). *See also* SSR 16-3p, 2017 WL 5180304, at *9 ("Persistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a variety of treatments, referrals to specialists, or changing treatment sources may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent.").

With respect to other treatment, the ALJ acknowledged that Plaintiff had required inpatient psychiatric hospitalization on multiple occasions (Tr. 18, 19, 20). He also acknowledged more than once that Plaintiff was in treatment with three different counselors on a weekly basis, "which she stated was beneficial" (Tr. 18; *see also* Tr. 17, 19). But it is not entirely clear what the ALJ made of Plaintiff's treatment history as the decision does not explain whether the ALJ thought it supported or undermined her claim of disability.

As for her daily activities, the ALJ did not address Plaintiff's own statements regarding her daily activities other than to say they were "significantly limited" (Tr. 18). The ALJ instead relied on the Third-Party Function Report filled out by Plaintiff's grandfather, for which he provided the following summary:

> [Plaintiff] provided care for her children, showered, dressed herself, prepared slight meals, and provided assistance with schoolwork. [She] had no problems attending to her personal needs, preparing meals, and perform[ing] household chores (i.e., laundry, vacuuming, and cleaning). [She] shopped in stores and by phone. [She] managed her finances, watched television, engaged on social media (i.e. Facebook), talked on the phone, and was in treatment with three different counselors on a weekly basis.

(Tr. 19). The ALJ remarked that "these activities, when viewed in conjunction with the claimant's allegations of pain and dysfunction, further belies the persuasiveness of the claimant's allegations as the degree of limitation alleged is inconsistent with what is documented in her treatment records suggested she is more functional than she is alleging." (Tr. 19).

From the outset, the above analysis contains several inaccuracies. Plaintiff has only one child, but there is a reference to "children" and the ALJ references allegations of "pain," but Plaintiff did not testify about pain—she alleged disability due to psychological impairments. But more importantly, the decision does not analyze how these activities were inconsistent with Plaintiff's reports of disabling mental symptoms or why they suggested she was capable of competitive employment (*see* Tr. 13–24). *See Ghiselli*, 837 F.3d at 778 (remanding where the ALJ failed to "identify a basis for his conclusion that the life activities [the claimant] reported were inconsistent with the

physical impairments she claimed"). As the Seventh Circuit has repeatedly cautioned, there are "critical differences between activities of daily living and activities in a full-time job." *E.g., Id.* (citation omitted); *see also Stark v. Colvin*, 813 F.3d 684, 688 (7th Cir. 2016) ("[A] person performing chores has flexibility in scheduling, can receive help, and is not held to a minimum standard of performance, unlike an employee.") And here, there is simply no explanation as to how Plaintiff's daily activities undermine her claims of severe mental health symptoms that prevent her from holding down a full-time job.[17]

Additionally, the ALJ also overlooked, or did not engage with, the limitations that Plaintiff had with her daily activities. For example, her grandfather said he and his wife helped Plaintiff care for her daughter and with general daily activities due to her anxiety and panic problems. Plaintiff's counseling records contain statements that she found parenting her daughter extremely difficult and overwhelming and that she received significant assistance from her grandparents and aunt in taking care of her daughter. *See, e.g., Craft*, 539 F.3d at 680 (remanding because ALJ ignored claimant's qualifications "as to *how* he carried out [daily living] activities").

In sum, the ALJ failed to sufficiently explain and support his decision to discount Plaintiff's statements regarding the intensity, persistence, and limiting effects of her symptoms and likewise failed to account for and reconcile the evidence contrary to his

---

[17] *See, e.g., Lanigan*, 865 F.3d at 564 (activities like caring for pets and vacuuming the house are "wholly irrelevant" to competitive employment); *Stark*, 813 F.3d at 688 (concluding that the claimant's "persistence in struggling through household chores despite her pain does not mean, as the ALJ extrapolated, that she can manage the requirements of the work-place"); *Hill v. Colvin*, 807 F.3d 862, 865, 869 (7th Cir. 2015) (warning against equating the activities of daily living—like babysitting, caring for pets, going to church, visiting with family members, and doing household chores—with those of a full-time job).

conclusion. These errors had a material effect on the ALJ's assessments of the Plaintiff's symptoms and her RFC, and therefore require reversal.

The Court wants to emphasize, however, that this Order should not be construed as an indication that it believes the ALJ was required to reach a certain conclusion about the credibility of Plaintiff's testimony or the severity of her symptoms, or that Plaintiff is entitled to benefits. On the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings. The ALJ's decision is being reversed because he failed to address all of the evidence and sufficiently explain his determinations.

### CONCLUSION

The Commissioner's final decision denying Plaintiff Kelly S's application for social security Disability Insurance Benefits and Supplemental Security Income benefits is **REVERSED** and **REMANDED** to the Commissioner, pursuant to sentence four of 42 U.S.C. §405(g), for further proceedings consistent with this Order. The Clerk of Court is directed to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED.**

**DATED: September 30, 2024**

**s/ Mark A. Beatty**
**MARK A. BEATTY**
**United States Magistrate Judge**